1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SAMUEL TURNER,                          No.  2:20-cv-00046-DAD-JDP

12              Plaintiff,

13        v.                                 ORDER GRANTING PLAINTIFF'S MOTION
                                             FOR PRELIMINARY APPROVAL OF
14   LTF CLUB MANAGEMENT CO, LLC, et         CLASS ACTION SETTLEMENT
     al.,
15                                           (Doc. No. 95)
              Defendants.
16

17

18        This matter is before the court on plaintiff's motion for preliminary approval of class

19   action settlement of plaintiff's wage and hour class action lawsuit brought against defendants LTF

20   Club Management Co, LLC and Life Time Fitness, Inc.  (Doc. No. 95.)  On February 24, 2025,

21   plaintiff's motion was taken under submission on the papers pursuant to Local Rule 230(g).

22   (Doc. No. 96.)  For the reasons explained below, the court will grant plaintiff's motion.

23                                **BACKGROUND**

24        Defendants are in the business of operating health and athletic clubs and previously

25   employed plaintiff as an hourly-paid, non-exempt shift supervisor from December 2017 to

26   approximately October 2018.  (Doc. No. 32 at ¶¶ 27, 29.)

27        As summarized in the pending motion, on November 21, 2019, plaintiff Turner initially

28   filed his class action complaint in Sacramento County Superior Court, asserting several wage and

                                       1

hour causes of action, including those asserting violations of California's Unfair Competition Law and provisions of the California Labor Code. (Doc. No. 95 at 9; 1-2 at 4.) Defendants filed a notice of removal in this court on January 6, 2020 on the basis of the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §§ 1332(d), 1453) because the number of potential class members exceeded 100, the parties are citizens of different states, and the amount in controversy in this action exceeds $5,000,000. (Doc. No. 1 at 3.) On January 13, 2020, defendants filed a motion to dismiss plaintiff's complaint in its entirety, which was granted by the previously assigned district judge, with leave to amend. (Doc. Nos. 4, 16.) On September 4, 2020, plaintiff filed his first amended complaint ("FAC"), and defendants subsequently filed a motion to dismiss the FAC in its entirety, which was again granted by the court with leave to amend. (Doc. Nos. 19, 20, 31.) On April 25, 2022, plaintiff his filed operative second amended complaint ("SAC"), realleging ten of his original eleven claims. (Doc. No. 32.) On May 9, 2022, defendants filed a third motion to dismiss, seeking to dismiss all ten of plaintiff's claims asserted in the SAC. (Doc. No. 33.)[1] On November 7, 2022, the court granted defendants' motion in part and dismissed plaintiff's eighth claim for failure to reimburse without further leave to amend, but denied defendants' motion as to plaintiff's nine other claims. (Doc. No. 40.)

Thereafter, plaintiff's counsel "conducted significant investigation into this case," "engaged in formal and informal discovery, including Plaintiff's deposition and the depositions of a handful of Defendants' employees" and written discovery, "reviewed and analyzed thousands of pages of documents and data Defendants produced" including employment records, time and pay data, timecard and wage statement statistics, handbooks, agreements, forms, and policy and procedure documentation, and "engag[ed] experts." (Doc. No. 95 at 16, 21.) Following a mediation session with mediator Paul Grossman on October 10, 2024, the parties agreed to settle this case. (Doc. No. 95-1 at ¶ 33.) On January 28, 2025, plaintiff filed a motion for preliminary approval of the class and Private Attorney Generals Act of 2004 ("PAGA") action settlement. (Doc. No. 95.) The parties attached thereto their executed long-form Joint Stipulation of Class

---

[1] On August 25, 2022, this case was reassigned to the undersigned. (Doc. No. 38.)

Action and PAGA Settlement (the "Settlement Agreement").  (Doc. No. 95-1 at 19–51.)  In his

pending motion, plaintiff seeks an order from this court:  (1) provisionally certifying the

settlement class, for settlement purposes only, with appointment of plaintiff Turner as class

representative, appointment of plaintiff's counsel as class counsel, and approval of Simpluris, Inc.

("Simpluris") as the Settlement Administrator; (2) preliminarily approving the parties' proposed

settlement; (3) approving and directing the mailing of the proposed Class Notice; and

(4) scheduling the hearing date for the final approval of the class settlement.  (Doc. No. 95 at 2.)

On August 7, 2025, the court directed the parties to file supplemental briefing addressing the

valuation of plaintiff's claims and the reasonableness of plaintiff's requested attorneys' fees.

(Doc. No. 102.)  On August 21, 2025, plaintiff filed supplemental briefing addressing those issues

in support of the pending motion for preliminary approval pursuant to the court's order.  (Doc.

Nos. 102, 103.)

**THE PROPOSED SETTLEMENT**

**A.    The Class**

    For settlement purposes, the parties request approval of the following class (the "Class")

of an estimated 7,518 individuals (the "Class Members" or "Settlement Class"):  "all current and

former hourly-paid or non-exempt employees who worked for any of the Defendants within the

State of California at any time during the Class Period," which extends from "November 21, 2015

through the Preliminary Approval Date."  (Doc. No. 95-1 at 20–21.)

**B.    Aggrieved Employees Under the PAGA**

    The parties have defined "Aggrieved Employees" in the Settlement Agreement as "all

nonexempt employees of Defendants in California at any time from September 17, 2018 to the

date of preliminary approval[,] . . . even if the employee opts out of the class settlement."  (*Id.* at

22.)

**C.    Class Period**

    As stated in the parties' Settlement Agreement and noted above, the Class Period "means

November 21, 2015 through the Preliminary Approval Date."  (*Id*. at 21.)  Further, the parties

/////

3

have defined the PAGA Period as extending from "September 17, 2018 through the Preliminary Approval Date." (*Id.* at 23.)

**D.      The Release of Claims**

The Settlement Agreement defines the released parties as "Life Time, Inc. (erroneously sued as Life Time Fitness, Inc.) and LTF Club Management Co., LLC, all of their present and former parents, subsidiaries, affiliates, and joint ventures, and all of their shareholders, members, managers, officers, officials, directors, employees, agents, servants, registered representatives, attorneys, insurers, successors, and assigns, and any other persons acting by, through, under, or in concert with any of them." (Doc. No. 95-1 at 23–24.) The "Released Class Claims" are defined as:

> any and all claims (i) asserted in this Action on behalf of the Class, including in the Complaint, or (ii) arising from, or derivative of, the claims or factual allegations asserted in this Action regarding Defendants' alleged: (1) failure to pay all overtime; (2) failure to provide proper meal periods, or premium pay for non-compliant meal periods; (3) failure to authorize and permit rest periods, or premium pay for non-compliant rest periods; (4) failure to pay minimum wages; (5) failure to pay all wages on termination of employment; (6) failure to pay timely wages during employment; (7) failure to provide accurate wage statements; (8) failure to maintain requisite payroll records; and (9) unreimbursed business expenses pursuant to Labor Code Sections 2800 and 2802.

(*Id.* at 40–41.) In addition, the Settlement Agreement provides for the release of PAGA claims ("Released PAGA Claims"), which are defined as:

> any and all claims, rights, or causes of action for civil penalties (and for all resulting penalties, attorneys' fees, litigation costs, interest, and any other relief) under California Labor Code Sections 2698 et seq., (i) asserted in this Action, including in Complaint, or (ii) arising from, or derivative of, the claims or factual allegations asserted in this Action regarding Defendants' alleged: (1) failure to pay all overtime; (2) failure to provide proper meal periods, or premium pay for non-compliant meal periods; (3) failure to authorize and permit rest periods, or premium pay for non-compliant rest periods; (4) failure to pay minimum wages; (5) failure to pay all wages on termination of employment; (6) failure to pay timely wages during employment; (7) failure to provide accurate wage statements; (8) failure to maintain requisite payroll records; and (9) unreimbursed business expenses pursuant to Labor Code Sections 2800 and 2802.

(*Id.* at 41.) The Settlement Agreement does not explicitly state that all Aggrieved Employees are

4

1   subject to the release of the Released PAGA Claims, regardless of whether or not they opt out of

2   the Class.  There is also a separate release of claims provision pertaining to plaintiff individually:

> As of the Effective Date, and as a condition of receiving any portion of the Service Payment, Plaintiff agrees to the additional following General Release:  In consideration of Defendants' promises and agreements as set forth herein, Plaintiff hereby fully releases the Released Parties from any and all Released Class Claims and Released PAGA Claims and also generally releases and discharges the Released Parties, and all of their present and former parents, subsidiaries, affiliates, and joint ventures, shareholders, members, managers, officers, officials, directors, employees, agents, servants, registered representatives, attorneys, insurers, successors, and assigns, from any and all claims, demands, obligations, causes of action, rights, or liabilities of any kind which have been or could have been asserted against them through the date that this Agreement is fully executed.  This general release includes, but is not limited to, claims arising out of or relating to Plaintiff's employment by Defendants and/or the termination of his employment with Defendants, including but not limited to any and all claims for violation of any section of the California Labor Code and/or Wage Orders; violation of the Fair Labor Standards Act ("FLSA"); failure to pay wages, benefits, vacation pay, severance pay, final pay, or other compensation of any sort; fraud; intentional or negligent misrepresentation; breach of contract; promissory estoppel; wrongful termination; retaliation; violation of public policy; breach of implied covenant of good faith and fair dealing; defamation; unlawful effort to prevent employment; sexual harassment; discrimination on the basis of race, color, sex, national origin, ancestry, religion, age, disability, handicap, medical condition, marital status or any other protected class; any claim under the Fair Credit Reporting Act, California Consumer Credit Reporting Agencies Act, California Investigative Consumer Reporting Agencies Act, or other laws regarding background checks; any claim under Title VII of the Civil Rights Act of 1964 (Title VII, as amended), 42 U.S.C. §§ 2000, *et seq*.; the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), the California Fair Employment and Housing Act ("FEHA"), or California Government Code §§ 12940 *et seq*.; violation of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"); violation of the Occupational Safety and Health Act ("OSHA") or any other health and/or safety laws, statutes or regulations; violation of the Employment Retirement Income Security Act of 1974 ("ERISA"); violation of the Internal Revenue Code; any other claim arising from employment or termination of employment; or other common law or tort matters and all other claims under federal, state or local law (collectively, "Class Representative's Released Claims").  This release specifically includes any and all claims, demands, obligations and/or causes of action for damages, restitution, penalties, injunctive or equitable relief, interest, and attorneys' fees and costs (except provided by the Settlement Agreement) relating to or in any way connected with the matters referred to in this paragraph, whether or not known or suspected to exist, and whether or not specifically or particularly described herein.  Specifically, Plaintiff waives all rights

and benefits afforded by California Civil Code Section 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

(*Id*. at 41–43.)  The "Released Claims" are defined as a collective of the Released Class Claims, the Released PAGA Claims, and the Class Representative's Released Claims.  (*Id*. at 23.)

**E.     Summary of the Settlement Terms**

Under the parties' Settlement Agreement, defendants will pay a maximum settlement amount ("MSA") of $1,250,000.00 allocated as follows:  (1) up to $437,500 for attorneys' fees and up to $97,000 for plaintiff's counsel's documented litigation costs; (2) a $10,000 incentive award for the named plaintiff; (3) $187,500 in civil PAGA penalties, with $140,625 of the penalties payable to the California Labor and Workforce Development Agency ("LWDA"); and (4) up to $45,300 for settlement administration costs.  (Doc. No. 95-1 at 22.)  Defendants will deliver the MSA and the estimated amount for employer-related payroll taxes into a Qualified Settlement Fund ("QSF").  (*Id*. at 39.)  The QSF funds are non-reversionary, meaning no portion will revert to defendants for any reason.  (*Id*.)

Assuming these allocations are awarded in full, approximately $519,575.00 in a net settlement amount will be available for distribution to Class Members who do not submit a timely and valid request to be excluded from the settlement.  (*Id*. at 14.)  The settlement is projected to pay each Class Member an average of $62.88, less employee taxes.  (*Id*. at 15.)  After the funds are distributed to the Class Members, the Class Members will have 120 days to cash their checks.  (*Id*. at 39.)  Any remaining amounts from uncashed checks will be redistributed to Class Members who cashed their payments from the initial distribution.  (*Id*.)  However, if the average new payment to be redistributed to each Class Member would be less than $2.00, then no second distribution will occur.  (*Id*.)  Settlement proceeds remaining after the second distribution (or if there is no second distribution, the first distribution), along with any amounts that would have

/////

1    been paid to Class Members who request exclusion, will be delivered to Legal Aid at Work,

2    thereby leaving no unpaid residue.  (*Id.*)

3    <center>**LEGAL STANDARDS**</center>

4    **A.    Rule 23 Settlements**

5          Class actions require the approval of the district court before settlement.  Fed. R. Civ. P.

6    23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

7    purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the

8    court's approval.").  "Approval under 23(e) involves a two-step process in which the Court first

9    determines whether a proposed class action settlement deserves preliminary approval and then,

10   after notice is given to class members, whether final approval is warranted."  *Haro v. Walmart,*

11   *Inc.*, No. 1:21-cv-00239-NODJ-SKO, 2024 WL 1160492, at *4 (E.D. Cal. Mar. 18, 2024) (citing

12   *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)).

13         The first step in the two-step process is preliminary approval.  During preliminary

14   approval, the court conducts a preliminary fairness evaluation to determine if notice of the class

15   action settlement should issue to class members and, if applicable, whether the proposed

16   settlement class should be certified.  *See* David F. Herr, *Annotated Manual Complex Litig.*

17   § 21.632 (4th ed.).  Under Rule 23(e)(1), the court must direct notice to all class members who

18   would be bound by the settlement proposal if the parties show that "the court will likely be able

19   to:"  (i) approve the proposal under Rule 23(e)(2)'s fair, reasonable, and adequate standard; and

20   (ii) certify the proposed settlement class.  Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint*

21   *Gov't Sols. Inc.*, No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014)

22   (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting

23   that federal courts generally grant preliminary approval if "the proposed settlement appears to be

24   the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does

25   not improperly grant preferential treatment to class representatives or segments of the class, and

26   falls within the range of possible approval").

27         The second step of the process is the final approval.  During final approval, "[i]f the

28   proposal would bind class members, the court may approve it only after a hearing and only on

<center>7</center>

1  finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In doing so, the court

2  must consider several factors, including whether: "the class representatives and class counsel

3  have adequately represented the class"; "the proposal was negotiated at arm's length"; "the

4  proposal treats class members equitably relative to each other"; and "the relief provided for the

5  class is adequate." *Id.* When considering whether "the relief provided for the class is adequate,"

6  the court should also take into account the following:

7      (i) the costs, risks, and delay of trial and appeal;

8      (ii) the effectiveness of any proposed method of distributing relief to
9      the class, including the method of processing class-member claims;

10      (iii) the terms of any proposed award of attorney's fees, including
       timing of payment; and

11      (iv) any agreement required to be identified under Rule 23(e)(3).

12  *Id.* In addition to the two-step review process, Rule 23(e) also requires that: (i) the parties

13  seeking approval file a statement identifying the settlement agreement; (ii) class members be

14  given an opportunity to object; and (iii) no payment be made in connection with forgoing or

15  withdrawing an objection, or forgoing, dismissing, or abandoning an appeal. Fed. R. Civ. P.

16  23(e)(3), (5).

17      "Courts have long recognized that settlement class actions present unique due process

18  concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935,

19  946 (9th Cir. 2011) (internal quotation marks and citations omitted). To protect the rights of

20  absent class members, Rule 23(e) requires that the court approve such settlements "only after a

21  fairness hearing and a determination that the settlement is fair, reasonable, and adequate." *Id.*

22  When approval is sought of a settlement negotiated before formal class certification, "there is an

23  even greater potential for a breach of fiduciary duty owed the class during settlement." *Id.* In

24  such circumstances, the "settlement approval requires a higher standard of fairness" and a "more

25  exacting review" so as "to ensure that class representatives and their counsel do not secure a

26  disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to

27  represent." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks

28  and citations omitted). Rule 23 also "demand[s] undiluted, even heightened, attention" to the

8

1  certification requirements when class certification is sought only for purposes of settlement.

2  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Accordingly, the district court must

3  examine the propriety of certification under Rule 23 both at this preliminary stage and at a later

4  fairness hearing. *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

5  **B.    PAGA Settlements**

6      Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor

7  code violations on behalf of himself and other current or former employees. Cal. Lab. Code

8  § 2699(a).[2] A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law

9  enforcement agencies." *Arias v. Super. Ct.*, 46 Cal. 4th 969, 986 (2009). Thus, a judgment in a

10  PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by

11  a judgment in an action brought by the government." *Id.*

12      The PAGA statute imposes several limits on litigants. First, because a PAGA action

13  functions as a "substitute" for an action brought by the state government, a plaintiff suing under

14  PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages

15  available privately through direct or class action claims. *Iskanian v. CLS Transp. L.A., LLC*, 59

16  Cal. 4th 348, 381 (2014), *overruled on other grounds by Quach v. Cal. Com. Club, Inc*., 16 Cal.

17  5th 562 (2024), *and abrogated on other grounds by Viking River Cruises, Inc. v. Moriana*, 596

18  U.S. 639 (2022); *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175, 182, 193 (2019), *rev'd in part on*

19  *other grounds by Viking River Cruises, Inc.*, 596 U.S. 639. Second, to bring an action under

20  PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the

21  employer. Cal. Lab. Code § 2699.3(a)(1). Third, any civil penalties recovered must be divided

22  between the LWDA and the aggrieved employees. *See* Cal. Lab. Code § 2699(i) (2016)

23  (requiring a 75%-25% apportionment); *id.* § 2699(m), (v)(1) (2024) (noting that the 2024

24  amendments, including the new 65%-35% apportionment requirement, apply only to "civil

25  /////

26

---

27  [2] An "aggrieved employee" is defined as "any person who was employed by the alleged violator against whom one or more of the alleged violations was committed . . . ." Cal. Lab. Code

28  § 2699(c)(1).

1    action[s] brought on or after June 19, 2024").[3]  Fourth, and finally, the proposed settlement must

2    be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA

3    claims.  *Id.* § 2699(s)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959,

4    971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a PAGA claim

5    "compromises a claim that could otherwise be brought be the state," it requires that a court

6    "review and approve any settlement of any civil action pursuant to [PAGA]").

7            Although there is no binding authority setting forth the appropriate standard of review to

8    be employed for PAGA settlements, California district courts "have applied a Rule 23-like

9    standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and

10   reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 972

11   (quoting *Jordan v. NCI Grp.*, No. 16-cv-01701-JVS-SP, 2018 WL 1409590, at *2 (C.D. Cal. Jan.

12   5, 2018)).  This standard is derived principally from the LWDA itself.  In commenting on a

13   proposed settlement including both class action and PAGA claims, the LWDA has offered the

14   following guidance:

15           It is thus important that when a PAGA claim is settled, the relief
             provided for under the PAGA be genuine and meaningful, consistent
16           with the underlying purpose of the statute to benefit the public and,
             in the context of a class action, the court evaluate whether the
17           settlement meets the standards of being "fundamentally fair,
             reasonable, and adequate" with reference to the public policies
18           underlying the PAGA.

19   *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

20   guidance with approval).[4]  Recognizing the distinct issues presented by class actions, this court is

---

21   [3]  Plaintiff provided notice to the LWDA in accordance with the PAGA on September 17, 2019
22   and initiated this action on November 21, 2019.  (Doc. No. 95 at 3.)  Accordingly, the court
     agrees with the parties that the 75%-25% apportionment of civil penalties between the LWDA
23   and the Aggrieved Employees applies here, since the 2024 amendments are not retroactive.  *Cf.
     Mendoza v. Movement Mortg., LLC*, No. 2:24-cv-03479-DAD-CSK, 2025 WL 1646897, at *4 n.4
24   (E.D. Cal. June 11, 2025) ("For PAGA actions brought prior to June 19, 2024, plaintiffs received
     25% of the penalties and the LWDA received 75%. . . .  Because this action was commenced
25   after June 19, 2024, the 35% apportionment applies.").

26   [4]  The LWDA has also stated that it "is not aware of any existing case law establishing a specific
27   benchmark for PAGA settlements, either on their own terms or in relation to the recovery on
     other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC, Doc. No.
28   736 at 2–3 (N.D. Cal. July 29, 2016).

                                                    10

1    persuaded by the LWDA's reasoning cited by the district court in *O'Connor* and therefore adopts

2    its proposed standard in evaluating the PAGA portion of the settlement now before the court for

3    preliminary approval.  *See, e.g.*, *Castro v. Paragon Indus.*, No. 1:19-cv-00755-DAD-SKO, 2020

4    WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *see also Bell v. Home Depot U.S.A., Inc.*, No. 2:12-

5    cv-02499-DJC-CKD, 2025 WL 1557142, at *5 n.3 (E.D. Cal. June 2, 2025).  Accordingly, the

6    court will approve a settlement of PAGA claims upon a showing that the settlement terms:

7    (1) meet the statutory requirements set forth by PAGA; and (2) are fundamentally fair,

8    reasonable, and adequate in view of PAGA's public policy goals.

9         When a proposed settlement involves overlapping class action and PAGA claims, courts

10   may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair,

11   reasonable, and adequate with reference to the public policies underlying the PAGA."  *O'Connor*,

12   201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*);

13   *McClure v. Brand Energy Serv., LLC*, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10

14   (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL

15   5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor*

16   explained:

17              For example, if the settlement for the Rule 23 class is robust, the
               purposes of PAGA may be concurrently fulfilled.  By providing fair
18             compensation to the class members as employees and substantial
               monetary relief, a settlement not only vindicates the rights of the
19             class members as employees, but may have a deterrent effect upon
               the defendant employer and other employers, an objective of PAGA.
20             Likewise, if the settlement resolves the important question of the
               status of workers as employees entitled to the protection of the Labor
21             Code or contained substantial injunctive relief, this would support
               PAGA's interest in "augmenting the state's enforcement capabilities,
22             encouraging compliance with Labor Code provisions, and deterring
               noncompliance."
23

24   *Id.* at 1134–35 (quoting the LWDA's guidance).  At the same time, where "the compensation to

25   the class amount[] is relatively modest when compared to the verdict value, the non-monetary

26   relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved

27   workers' rights and obligations], the settlement of the non-PAGA claims does not substantially

28   vindicate PAGA."  *Id.* at 1135.  Finally, "where plaintiffs bring a PAGA representative claim,

11

1    they take on a special responsibility to their fellow aggrieved workers who are effectively bound

2    by any judgment." *Id.* at 1134.  Plaintiff's special responsibility to other Aggrieved Employees is

3    especially significant because "PAGA does not require class action procedures, such as notice

4    and opt-out rights." *Id.*  Thus,

5            [t]he Court must be cognizant of the risk that despite this
         responsibility, there may be a temptation to include a PAGA claim
6            in a lawsuit to be used merely as a bargaining chip, wherein the rights
         of individuals who may not even be members of the class and the
7            public may be waived for little additional consideration in order to
         induce the employer to agree to a settlement with the class.

8

9    *Id.*

10                                    **ANALYSIS**

11   **A.      Preliminary Class Certification**

12          The class action is a procedural mechanism whereby the "usual rule that litigation be

13   conducted by and on behalf of the named parties only" is swept aside so that multiple parties—

14   unwieldy in number but possessing similar or identical claims—may pursue common redress in

15   an efficient and economical manner.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation

16   omitted).  Here, the parties seek preliminary certification of the proposed class under Federal

17   Rule of Civil Procedure 23, which governs class certification and imposes a two-step process in

18   deciding whether a class may be certified.

19          First, Rule 23(a) requires the moving party to demonstrate the existence of four

20   prerequisites:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  *See Lozano v.*

21   *AT&T Wireless Servs., Inc.*, 504 F.3d 718, 730 (9th Cir. 2007).  Second, when a putative class

22   satisfies these four prerequisites, it may then proceed to show it also satisfies at least one of the

23   provisions of Rule 23(b).  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998),

24   *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  The party

25   seeking class certification bears the burden of establishing conformity with this two-step process

26   and must do so by producing facts that "affirmatively demonstrate" that class certification is

27   warranted.  *Comcast*, 569 U.S. at 33.  Only after conducting a "rigorous analysis" of the produced

28   facts and determining that they show compliance with Rule 23(a) and (b), may a district court

1    certify a class. *Id.* at 33–34; *see also Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2016

2    WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule

3    23(a) and Rule 23(b).").

4            Accordingly, below the court will first address the Rule 23(a) requirements followed by

5    the requirements for a Rule 23(b)(3) certification, which plaintiff contends apply here. (Doc. No.

6    95 at 22–23.)

7        1.    Rule 23(a) Requirements

8            a.    *Numerosity*

9            The first Rule 23(a) requirement is that "the class is so numerous that joinder of all

10   members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement demands

11   "examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel.*

12   *Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Courts have found the requirement

13   satisfied when the class comprises as few as thirty-nine members or where joining all class

14   members would serve only to impose financial burdens and clog the court's docket. *See Murillo*

15   *v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing the

16   thresholds for numerosity under Ninth Circuit precedent and listing cases).

17           Here, plaintiff estimates that there are approximately 7,518 members in the Settlement

18   Class. (Doc. No. 95 at 23.) This showing with respect to numerosity is adequate to meet the

19   requirements of Rule 23(a)(1). *See Arredondo v. Sw. & Pac. Specialty Fin., Inc*., No. 1:18-cv-

20   01737-DAD-SKO, 2022 WL 396575, at *8 (E.D. Cal. Feb. 9, 2022) (finding the plaintiff's

21   estimation of 690 members in the proposed settlement class to be an adequate showing with

22   respect to numerosity).

23           b.    *Commonality*

24           The second Rule 23(a) requirement is that "there are questions of law or fact common to

25   the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the class

26   representatives must demonstrate that common questions of fact and law will drive or resolve the

27   litigation. *See Wal-Mart Stores, Inc.*, 564 U.S. at 350. "[C]ommonality requires that the class

28   members' claims depend upon a common contention such that determination of its truth or falsity

13

1   will resolve an issue that is central to the validity of each claim in one stroke." *Mazza v. Am.*

2   *Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotations omitted) (quoting *Wal-*

3   *Mart*, 564 U.S. at 350). "The plaintiff must demonstrate the capacity of classwide proceedings to

4   generate common answers to common questions of law or fact that are apt to drive the resolution

5   of the litigation." *Id.*  For example, "[c]ommonality is generally satisfied where the lawsuit

6   challenges a system-wide practice or policy that affects all of the putative class members."

7   *Benitez v. W. Milling, LLC*, No. 1:18-cv-01484-SKO, 2020 WL 309200, at *5 (E.D. Cal. Jan. 21,

8   2020) (internal quotation marks and citations omitted).

9          The commonality requirement does not mandate that all questions of law or fact be

10  common to every single class member and "dissimilarities among class members do not

11  [necessarily] impede the generation of common answers to those questions . . . ." *Parsons v.*

12  *Ryan*, 754 F.3d 657, 675 (9th Cir. 2014); *but see Wal-Mart*, 564 U.S. at 349 (citation omitted)

13  (noting that "[d]issimilarities within the proposed class . . . have the *potential* to impede the

14  generation of common answers") (emphasis added).  However, merely raising any common

15  question does not suffice.  *See Wal-Mart*, 564 U.S. at 349 (noting the language of Rule 23(a)(2) is

16  "easy to misread" because "[a]ny competently crafted class complaint literally raises common

17  'questions'") (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,

18  84 N.Y.U. L. Rev. 97, 131–32 (2009)).  Instead, the common question must depend upon a

19  common contention; that common contention must be answerable through a classwide

20  proceeding; and that common answer should have the potential to drive the litigation towards

21  resolution.  *See id.* at 349–50.

22         Here, plaintiff asserts in his SAC that "[t]here are common questions of law and fact as to

23  the class members that predominate over questions affecting only individual members."  (Doc.

24  No. 32 at ¶ 16.)  The SAC then lists thirteen common questions of law and fact.  (*Id.*)  In

25  plaintiff's pending motion for preliminary approval, he has summarized the common issues of

26  fact and law as whether "[d]efendants uniformly failed to pay all Class Members all

27  compensation due to them during the Class Period," and in particular, whether defendants had a

28  "uniform policy and systematic scheme" of "failing to pay regular, minimum, and overtime

14

1  wages properly," "failing to pay all compensation due for work performed," and "failing to

2  provide compliant meal and rest periods and associated premium pay." (Doc. No. 95 at 23–24.)

3       Because the issues noted above "would form the basis of each [] plaintiff's claims," the

4  court finds that commonality is satisfied here. *Bykov v. DC Transp. Servs.*, *Inc.*, No. 2:18-cv-

5  01691-DB, 2019 WL 1430984, at *3 (E.D. Cal. Mar. 29, 2019) (citation omitted); *see also*

6  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165–66 (9th Cir. 2014) (finding that the

7  commonality requirement was satisfied when class action claims brought against an employer

8  included the common question of whether the employer had a practice or unofficial policy of

9  requiring putative class members to work unpaid off-the-clock overtime).

10           c.    *Typicality*

11       The third Rule 23(a) requirement is satisfied if "the claims or defenses of the

12  representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

13  "The typicality requirement looks to whether the claims of the class representatives are typical of

14  those of the class and is satisfied when each class member's claim arises from the same course of

15  events, and each class member makes similar legal arguments to prove the defendant's liability."

16  *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citations and internal quotation marks

17  omitted), *abrogated on other grounds by Jennings v. Rodriguez*, 583 U.S. 281, (2018).  The

18  typicality requirement is a permissive standard:  "[class] representative claims are 'typical' if they

19  are reasonably co-extensive with those of absent class members; they need not be substantially

20  identical." *Hanlon*, 150 F.3d at 1020.  Courts evaluate typicality by considering "whether other

21  [class] members have the same or similar injury, whether the action is based on conduct which is

22  not unique to the named plaintiffs, and whether other class members have been injured by the

23  same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)

24  (citations omitted) ("[C]lass certification is inappropriate where a putative class representative is

25  subject to unique defenses which threaten to become the focus of the litigation.").

26       Here, plaintiff states that his claims and those of the putative Class Members "involve the

27  same allegations, facts, supporting evidence, and applicable law," and his "claims are typical of

28  the Class because Defendants employed them during the Class Period, and they suffered wage-

15

1    and-hour problems typical of the Class." (Doc. No. 95 at 24.) In his declaration, plaintiff's

2    counsel Graham B. LippSmith also declares that "[a] review of Mr. Turner's employment files

3    shows that his claims are typical of the Class." (Doc. No. 95-1 at 10.)

4         Because the proposed class consists of employees who, like plaintiff, were employed by

5    defendants in California and were allegedly subjected to the same wage and hour violations and

6    uniform practices detailed above, the court finds that the claims brought by plaintiff are

7    "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. Thus,

8    the typicality requirement is satisfied here.

9                   d.    *Adequacy of Representation*

10        The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and

11   adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Resolution of this issue

12   requires the court to address the following questions: "(a) do the named plaintiffs and their

13   counsel have any conflicts of interest with other class members and (b) will the named plaintiffs

14   and their counsel prosecute the action vigorously on behalf of the class?" *Sali v. Corona Reg'l*

15   *Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018); *see also Pierce v. County of Orange*, 526 F.3d

16   1190, 1202 (9th Cir. 2008). "Adequacy of representation also depends on the qualifications of

17   counsel." *Sali*, 909 F.3d at 1007 (citation omitted).

18        Plaintiff contends that the adequacy of representation requirement is met here because he

19   "has no conflict with the Class." (Doc. No. 95 at 25.) Plaintiff asserts that his "individual claims

20   align with those of the Class," and he "does not have any individual claims or defenses" that

21   could put him in conflict with the Class. (*Id.*) He also states that he "has zealously pursued this

22   action on the Class's behalf and has taken seriously his role as potential class representative and

23   as California Private Attorney General, stepping up to pursue claims on behalf of others." (*Id.*)

24   Based on these assertions and the above description of plaintiff's claims, the court is satisfied that

25   plaintiff's interests align with those of the proposed Class Members and that plaintiff would

26   vigorously prosecute the action on behalf of the class.

27        Plaintiff's counsel has also submitted declarations to establish their adequacy as Class

28   counsel. (Doc. Nos. 95-1; 95-2.) According to the declaration of attorney LippSmith, counsel of

                                              16

record for plaintiff and the putative Class, he is the co-founder of LippSmith LLP and has been

practicing law in California since 2002. (Doc. No. 95-1 at ¶¶ 1, 5.)  Attorney LippSmith focuses

his work almost exclusively on representing plaintiffs, and he has declared that the lawyers at

LippSmith LLP have collectively recovered hundreds of millions of dollars in complex cases

brought against the largest companies in the world.  (*Id*. at ¶¶ 4, 6.)  While LippSmith LLP was

only founded in 2020, attorney LippSmith asserts that LippSmith LLP team members have

personally served as class counsel, putative class counsel, lead counsel, and committee counsel in

dozens of class action and mass action lawsuits, representing tens of millions of plaintiffs and

class members, collectively.  (*Id*. at ¶ 16.)  In support of this assertion, attorney LippSmith has

listed samplings of the firm's class action and mass action successes and cases in which his firm

is actively serving as class counsel.  (*Id*. at 5–9.)  Additionally, attorney Joanna Ghosh represents

in her declaration that she is also an attorney of record for plaintiff and is a managing member of

Lawyers for Justice, PC.  (Doc. No. 95-2 at ¶¶ 1, 5.)  Attorney Ghosh represents that for the past

decade, the Lawyers for Justice, PC firm has almost exclusively focused on the prosecution of

consumer and employment class actions, involving wage-and-hour claims, race discrimination,

unfair business practices, or consumer fraud, resulting in the recovery of millions of dollars on

behalf of thousands of individuals in California.  (*Id*. at ¶ 2.)  According to Attorney Ghosh, the

attorneys at Lawyers for Justice, PC focus on litigating complex wage-and-hour class and PAGA

representative actions and have successfully litigated cases involving overtime exemptions.  (*Id.*)

She also declares that Lawyers for Justice, PC is currently the attorney of record in well over a

dozen employment-related putative class actions in both state and federal courts in the State of

California.  (*Id*.)

      Because plaintiff and his counsel represent that there are no conflicts of interest with the

Class Members, and both LippSmith LLP and Lawyers for Justice, PC appear to be experienced

in class action litigation on behalf of plaintiffs, the court finds that the adequacy of representation

requirement has been preliminarily satisfied.

/////

/////

2.     Rule 23(b)(3) Requirements

The parties seek class certification under Rule 23(b)(3), which requires a finding that: (1) the questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action be superior to other available methods for fairly and efficiently adjudicating the controversy. *Amchem*, 521 U.S. at 615; *In re Hyundai and Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (*en banc*). The test under Rule 23(b)(3) is "far more demanding" than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

a.     *Predominance*

First, common questions must "predominate" over any individual questions. While this requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is higher at this stage of analysis. *Wal-Mart Stores, Inc.*, 564 U.S. at 359. While Rule 23(a)(2) can be satisfied by even a single question, Rule 23(b)(3) requires convincing proof that common questions "predominate" over individual questions. *Amchem*, 521 U.S. at 623–24. "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196–197 (5th ed. 2012)). "When common questions present a significant aspect of the case and can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

As discussed above, in this action plaintiff challenges defendants' "uniform operations and employment policies and procedures" that allegedly deprived Class Members of compensation due to them during the Class Period. (Doc. No. 95 at 23–24.) Plaintiff has alleged that, as a matter of "uniform pattern and practice," defendants failed to pay hourly employees for "all regular and/or overtime wages earned and for missed, shortened, late, and/or interrupted meal periods and rest breaks." (Doc. No. 32 at ¶ 35.) It is thus apparent that common issues of

18

1    whether Class Members were paid for hours worked and received legally compliant meal and rest

2    breaks predominate in this case, although there may be individual issues concerning "calculating

3    individual damages." *Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM-SAB,

4    2015 WL 4078135, at *6 (E.D. Cal. July 6, 2015).  The court therefore concludes that the

5    predominance requirement has been met in this case.  *See Munoz v. RDO Equip. Co.,* No. 1:23-

6    cv-00979-DAD-AC, 2025 WL 2158562, at *9 (E.D. Cal. July 30, 2025) ("Class actions in which

7    a defendant's uniform policies are challenged generally satisfy the predominance requirement of

8    Rule 23(b)(3)."); s*ee also Rojas-Cifuentes v. ACX Pac. Nw. Inc*., No. 2:14-cv-00697-CKD, 2025

9    WL 959206, at *9 (E.D. Cal. Mar. 31, 2025); *Castro*, 2020 WL 1984240, at *6.

10             b.       *Superiority*

11             Rule 23(b)(3) also requires a court to find that "a class action is superior to other available

12    methods for the fair adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To resolve the

13    Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing

14    separate actions individually, any litigation already in progress involving the same controversy,

15    the desirability of concentrating in one forum, and potential difficulties in managing the class

16    action—although the last two considerations are not relevant in the settlement context."  *Jones v.*

17    *Tirehub LLC*, No. 2:21-cv-00564-DB, 2024 WL 2132611, at *5 (E.D. Cal. May 13, 2024) (citing

18    *Palacios*, 2015 WL 4078135, at *6).

19             Here, plaintiff asserts that the superiority requirement is satisfied because the "prosecution

20    of separate actions by individual Class Members would create the risk of inconsistent or varying

21    adjudications," meaning that "a class action is superior means for the fair adjudication of the

22    case."  (Doc. No. 95 at 24.)

23             Given that "[a] common nucleus of facts and potential legal remedies" predominate here,

24    the court finds that these questions can be resolved for all members more efficiently and

25    expeditiously in a single action.  *Hanlon*, 150 F.3d at 1022.  Therefore, the court is satisfied that

26    the superiority requirement has been met in this case.

27             For all the foregoing reasons, the requirements for preliminary certification under Rule 23

28    have been satisfied, and the court finds that conditional certification of the Class is appropriate.

1    **B.    Preliminary Settlement Approval**

2           Plaintiff also seeks preliminary approval of the parties' proposed settlement.  Under Rule

3    23(e), a court may approve a proposed class action settlement only if it is a fair, reasonable, and

4    adequate resolution of the dispute. Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946.

5    Preliminary approval is appropriate when "the court will likely be able to" give final approval

6    under Rule 23(e)(2).  As such, "preliminary approval of a settlement has both a procedural and

7    substantive component" and is appropriate if:  (1) the proposed settlement appears to be the

8    product of serious, informed, non-collusive negotiations; and (2) the settlement falls within the

9    range of possible approval, has no obvious deficiencies, and does not improperly grant

10   preferential treatment to class representatives or segments of the class.  *Tableware Antitrust*

11   *Litig.*, 484 F. Supp. 2d at 1079 (citation omitted); *see also* Fed. R. Civ. P. 23(e)(1)(B).  Because

12   the proposed settlement in this case has a PAGA component, it must also meet the statutory

13   requirements under that act and be fundamentally fair, reasonable, and adequate in view of

14   PAGA's public policy goals.

15          1.    <u>The PAGA Component</u>

16          PAGA requires that a proposed settlement be submitted to the LWDA.  Cal. Lab. Code

17   § 2699(s)(2); *see also Haralson*, 383 F. Supp. 3d at 971 (citation omitted) (noting that a proposed

18   settlement should be submitted to the LWDA to allow it to comment if it so desires).  Here,

19   plaintiff states that he submitted the Settlement Agreement to the LWDA concurrently with this

20   pending motion, but the parties have not disclosed whether the LWDA has commented on the

21   settlement to date.  (Doc. No. 95 at 3.)[5]  In his motion for final approval, plaintiff is directed to

22   specify whether the LWDA has commented on the proposed settlement and, if so, the substance

23   of its comments.  The court will proceed with addressing the fairness, reasonableness, and

24   adequacy of the PAGA penalties below.

---

25   [5]  Plaintiff also does not state whether he submitted notice of the proposed settlement to the
26   appropriate federal and state officials, as is required by the CAFA pursuant to 28 U.S.C.
     § 1715(b).  Under § 1715(b), each participating defendant must serve notice of the proposed
27   settlement upon certain state and federal officials within ten days of the filing of the proposed
     settlement.  The parties are directed to inform the court in their motion for final approval whether
28   and, if so, when they provided such notice in accordance with § 1715(b).

1          2.          Procedural Fairness

2          "The court must [next] consider whether the process by which the parties arrived at their

3    settlement is truly the product of arm's length bargaining and not collusion or fraud." *Haro v.*

4    *Walmart, Inc.*, No. 1:21-cv-00239-KES-SKO, 2025 WL 73109, at *10 (E.D. Cal. Jan. 10, 2025)

5    (citing *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015)).  "A

6    settlement is presumed to be fair if it 'follow[s] sufficient discovery and genuine arm[']s-length

7    negotiation.'"  *Cavazos v. Salas Concrete Inc.*, No. 1:19-cv-00062-DAD-EPG, 2022 WL 506005,

8    at *13 (E.D. Cal. Feb. 18, 2022) (quoting *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977

9    (E.D. Cal. 2012)).  In addition, the parties' participation in mediation "tends to support the

10   conclusion that the settlement process was not collusive."  *Palacios*, 2015 WL 4078135, at *8

11   (citation omitted).

12          Here, as indicated above, the parties engaged in significant settlement negotiations and

13   participated in a formal mediation session with Paul Grossman, a well-regarded mediator

14   experienced in mediating labor and employment matters, prior to reaching the proposed

15   settlement.  (Doc. No. 95 at 13.)  Prior to and during settlement discussions, the parties exchanged

16   Class information and plaintiff's counsel "conducted significant investigation" through formal

17   and informal discovery, conducting depositions, and reviewing and analyzing thousands of pages

18   of documents, including employment records, handbooks, agreements, forms, policies, and time

19   and pay data.  (*Id*. at 16.)  According to their Settlement Agreement, the parties were not able to

20   reach an agreement to settle the action during their mediation session, which lasted an entire day.

21   (Doc. No. 95-1 at 27.)  However, after the mediation session, Mr. Grossman sent the parties a

22   Mediator's Proposal, which set forth a proposed agreement to resolve the case for

23   $1,250,000.000.  (*Id*. at 27–28.)  Both parties accepted this proposal and believe that this result is

24   a fair, adequate, and reasonable settlement which has been arrived at after "extensive arms-length

25   negotiations." (*Id*. at 28.)  Based on these representations, it appears that the Settlement

26   Agreement was the result of suitably extensive negotiation between capable counsel and,

27   accordingly, the court preliminarily concludes that the parties' negotiation constituted genuine,

28   informed, and arm's-length bargaining.

1          3.      Substantive Fairness

2                  a.      *Adequacy of the Settlement Amount*

3          In evaluating the fairness of a settlement award, "the settlement's benefits must be

4   considered by comparison to what the class actually gave up by settling." *Campbell v. Facebook,*

5   *Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. For Indep. S'holders of TMT*

6   *Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [the] process [of

7   evaluating settlements] . . . is the need to compare the terms of the compromise with the likely

8   rewards of litigation.")).  However, "[i]t is well-settled law that a cash settlement amounting to

9   only a fraction of the potential recovery does not *per se* render the settlement inadequate or

10  unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June

11  19, 2000) (citation omitted).  To determine whether a settlement "falls within the range of

12  possible approval," a court must focus on "substantive fairness and adequacy" and "consider

13  plaintiffs' expected recovery balanced against the value of the settlement offer." *Tableware*

14  *Antitrust Litig.*, 484 F. Supp. 2d at 1080.

15         The parties in this case have agreed to a $1,250,000.00 MSA.  (Doc. No. 95 at 20.)

16  Assuming the various allocations described above are awarded in full, the net settlement amount

17  will be approximately $519,575.00.  (*Id*. at 15.)  $46,875.00 of the net settlement amount will be

18  distributed on a *pro rata* basis to the Aggrieved Employees defendants employed in California as

19  non-exempt employees during the PAGA Period.  (Doc. No. 95-1 at 14–15.)  The remainder will

20  be distributed to the Class Members on a proportional and non-reversionary basis, with any

21  uncashed funds to be redistributed to Class Members and Aggrieved Employees who cashed their

22  payments, or delivered to Legal Aid at Work if the redistribution payments would be less than

23  $2.00.  (*Id*. at 29–30, 39.)

24         In his supplemental briefing submitted at the direction of the court, plaintiff estimates that

25  the maximum damages as to his core claims are approximately $36,331,660, with an additional

26  $17,448,288 maximum in waiting time penalties and a $7,695,900 maximum in PAGA penalties.

27  (Doc. No. 103 at 6–11.)  Of the potential maximum PAGA penalties, the LWDA would receive

28  75% ($5,771,925), and the remaining 25% ($1,923,975) would be available to Aggrieved

1   Employees.  Accordingly, the maximum potential recovery for recipients in this action is

2   approximately $55,703,923 ($36,331,660 + $17,448,288 + $1,923,975).  *See Cruz v. MM 879,*

3   *Inc*., No. 1:15-cv-01563-TLN-EPG, 2025 WL 1684354, at *15 (E.D. Cal. June 16, 2025)

4   (deducting the LWDA's portion of estimated PAGA penalty from the projected recovery amount

5   before calculating the percentage rate of recovery).  Accordingly, the MSA of $1,250,000

6   represents approximately 2.3% of plaintiff's maximum potential recovery as to all of his claims.

7   This proportion is on the low end of the range of the percentage recoveries that California district

8   courts—including this one—have found to be reasonable.  *See In re Heritage Bond Litig*., No. 02-

9   cv-01475-DT-RCX, 2005 WL 1594389, at *8 (C.D. Cal. June 10, 2005) (noting that in securities

10  class action settlements, "the median percentage of investors losses paid in settlement reached a

11  new low of 2.3%"); *Maciel v. Bar 20 Dairy, LLC*, No. 1:17-cv-00902-DAD-SKO, 2020 WL

12  5095885, at *14 (E.D. Cal. Aug. 28, 2020) (preliminarily approving a settlement where the

13  "Gross Settlement Amount of $450,000.00 [] represents an approximately five percent recovery

14  of the theoretical maximum"); *In re Splunk Inc. Sec. Litig*., No. 20-cv-08600-JST, 2024 WL

15  923777, at *6 (N.D. Cal. Mar. 4, 2024) (finding that "the $30 million settlement fund achieves a

16  good result for the class" even though it could represent as low as a 5% recovery of "the realistic

17  maximum damages for the Settlement Class"); *see also Custom LED, LLC v. eBay, Inc*, No. 12-

18  cv-00350-JST, 2014 WL 2916871, at *4 (N.D. Cal. June 24, 2014) ("Indeed, courts have held

19  that a recovery of only 3% of the maximum potential recovery is fair and reasonable when the

20  plaintiffs face a real possibility of recovering nothing absent the settlement.").

21         Plaintiff contends that, due to specific challenges present in this case, achieving an award

22  of the maximum damages estimate was not realistic.  (Doc. No. 103 at 5–12.)  As for one

23  challenge, before the parties filed their joint notice of settlement, defendants had opposed

24  plaintiff's motion for class certification, arguing that because defendants had lawful wage-and-

25  hour policies, several of plaintiff's claims depend on consideration of individual facts.  (Doc. No.

26  81 at 18–28.)  Defendants identified three decisions of other California district courts denying or

27  recommending denial of motions for class certification where the plaintiffs had alleged that wage-

28  and-hour violations occurred despite the defendants' lawful policies, because the reason

23

1    underlying those violations could not be determined without resorting to individual proof.  (*Id*. at

2    19.)  Given defendants' operation of eight different clubs in California, with each club having

3    various departments (such as the spa, the café, the tennis department, the personal training

4    department, etc.) with different department leaders, defendants argued that employee-specific

5    evidence in the form of team member testimony would be necessary in this case to resolve

6    plaintiff's claims.  (*Id*. at 9–10, 21.)  In addition, defendants had also filed a motion for partial

7    summary judgment in their favor, arguing that they were entitled to judgment as a matter of law

8    as to five of plaintiff's remaining claims.  (Doc. No. 62.)  In particular, defendants argued that

9    plaintiff cannot prove that defendants had any reason to know about the occurrence of unpaid

10   work, because plaintiff admitted during his deposition that managers were not present when he

11   allegedly continued working after clocking out, that undisputed records show that defendants

12   properly paid out overtime at the legal rate of 1.5 times the regular rate of pay, that plaintiff

13   cannot prove any willful violations of the Labor Code because defendants reasonably believed

14   that no additional wages were due to its employees, and that several of plaintiff's claims are

15   duplicative of one another.  (*Id*. at 10–11.)  Plaintiff contends that, as a result, he faced a "real

16   possibility that the Court could dismiss or substantially limit" his claims and that defendants

17   "advanced strong arguments that their policies were facially compliant with California law,"

18   which could lead the court to find that "violations were individualized and unsuitable for

19   classwide adjudication."  (Doc. No. 103 at 5.)  Finally, plaintiff also contends that based on his

20   experiences and his counsel's investigation and discovery, meal and rest break violations were the

21   most discernable from defendants' payroll data, whereas plaintiff's other claims, such as for

22   failure to pay overtime and waiting time, and for wage statement errors, were less discernable and

23   more vulnerable to defenses that any violation was trivial or not willful.  (Doc. No. 95 at 18.)

24          In his pending motion for class certification, plaintiff states that in light of these and other

25   concerns, his second and third claims, for meal and rest break violations, were the focus of and

26   drove the settlement discussions.  (*Id*.)  While somewhat difficult for the court to assess without

27   the benefit of the parties' discovery, plaintiff's contentions regarding the potential for failing to

28   prevail on a number of claims asserted appear to, at least preliminarily be reasonable, and are

1  strengthened by plaintiff's assertion that his counsel studied defendants' sample data and reached

2  this conclusion only after taking and reviewing sufficient discovery.[6]  (Doc. Nos. 95 at 21; 95-1 at

3  ¶¶ 34–39.)  As such, if the court were to consider the maximum potential recovery for only

4  plaintiff's second and third claims, which is estimated to be a combined $5,206,760, then the

5  MSA of $1,250,000 represents approximately 24% of the potential recovery, which is certainly

6  within the range, and even on the higher end, of recovery percentages which this court has found

7  to be adequate.  *See Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL

8  1984240, at *14 (E.D. Cal. Apr. 27, 2020) (preliminarily approving a gross settlement fund that

9  represents "an approximately 20 percent recovery of plaintiff's maximum potential claims");

10  *Gonzalez v. CoreCivic of Tenn., LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *10

11  (E.D. Cal. Mar. 26, 2020) (preliminarily approving settlement amount that "represents an

12  approximately 19 percent recovery").

13       While "a larger award was theoretically possible, 'the very essence of a settlement is

14  compromise, a yielding of absolutes and an abandoning of highest hopes.'"  *Barbosa v. Cargill*

15  *Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*,

16  151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)).  For these

17  reasons, the court will preliminarily approve the settlement amount reflected in the parties'

18  proposed settlement as being adequate.

19              b.     *PAGA Penalties*

20       The settlement also provides for $187,500.00 in civil PAGA penalties.  (Doc. No. 95 at 8.)

21  Pursuant to the PAGA before its recent amendment, 75% of the civil penalties, or $140,625.00,

22  will go to the LWDA, and 25%, or $46,875.00, will be included in the net settlement amount and

23  payable to Aggrieved Employees.  (*Id.*)  *See* Cal. Lab. Code § 2699(i) (2016) (requiring a 75%-

24  25% apportionment); *id.* § 2699(m), (v)(1) (2024) (noting that the 2024 amendments, including

25

26  ───────────────

    [6]  In their motion for final approval plaintiff's counsel are directed to explain in more detail how
    they reached the conclusion that plaintiff was less likely to prevail on his other claims, such as
27  those for failure to pay overtime and waiting time, and for wage statement errors.  Counsel are
    directed to also provide the court, if possible, with the violation rate percentages from the sample
28  data as to those other claims.

                                          25

1    the new 65%-35% apportionment requirement, apply only to "civil action[s] brought on or after

2    June 19, 2024").

3        As noted above, plaintiff's counsel calculated plaintiff's potential damages under

4    plaintiff's PAGA claim to be $7,695,900.  However, recognizing that courts have discretion to

5    ensure that PAGA penalties are not unjust, arbitrary and oppressive, or confiscatory, for the

6    purposes of settlement plaintiff's counsel has estimated that an 80% discount should be applied in

7    this case to account for the court's discretion.  (Doc. No. 103 at 11.)

8        The $187,500.00 allocated towards civil penalties in the Settlement Agreement represents

9    15% of the $1,250,000.00 MSA.  This proportion proposed to settle plaintiff's PAGA claims is

10   higher than other PAGA settlements approved by this court and "higher than ranges generally

11   approved by courts." *Perez v. Bodycote Thermal Processing, Inc.*, No. 22-cv-00145-RAO, 2024

12   WL 4329057, at *10 (C.D. Cal. Aug. 23, 2024); *see, e.g., Munoz*, 2025 WL 2158562, at *13

13   (preliminarily approving settlement with $100,000 allocated towards civil penalties, or 5% of the

14   $2,000,000 gross settlement amount); *Mondrian v. Trius Trucking, Inc*., No. 1:19-cv-00884-

15   DAD-SKO, 2022 WL 2306963 (E.D. Cal. June 27, 2022) (granting preliminary approval of a

16   settlement with $10,000 allocated towards civil penalties, or 1% of the $995,000 qualified

17   settlement fund); *Arredondo*, 2022 WL 396575, at *8 (granting preliminary approval of a

18   settlement where the amount allocated towards civil penalties represented 8% of the gross

19   settlement amount).  However, a higher allocation than average to the PAGA settlement does not

20   necessarily raise fairness concerns and instead suggests that plaintiff is being careful not to

21   "skirt[] the special responsibility to his fellow aggrieved workers or us[e] the PAGA claim merely

22   as a bargaining chip." *Perez*, 2024 WL 4329063, at *9 (citing *JD Tamimi v. SGS N. Am. Inc*, No.

23   19-cv-00965-PSG-KS, 2021 WL 3417645, at *10 (C.D. Cal. Mar. 2, 2021)).  The court therefore

24   preliminarily concludes that the settlement of plaintiff's PAGA claims is fair, reasonable, and

25   adequate in light of the PAGA's public policy goals.  *See O'Connor*, 201 F. Supp. 3d at 1133.

26              c.    *Attorneys' Fees*

27       When a negotiated class action settlement includes an award of attorneys' fees, the district

28   court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is

26

1   reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see*

2   *also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted).

3   Where, as here, fees are to be paid from a common fund, the relationship between the class

4   members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Sec. Litig.*, 618

5   F.3d 988, 994 (9th Cir. 2010) (citation omitted).  As a result, the district court must assume a

6   fiduciary role for the class members and "act with a jealous regard to the rights of those who are

7   interested in the fund in determining what a proper fee award is." *Id.* (internal quotation marks

8   and citations omitted).

9          In evaluating the award of attorneys' fees, "courts have discretion to employ either the

10  lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 (citations

11  omitted).  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic

12  application of either method, where it yields an unreasonable result, can be an abuse of

13  discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir.

14  2002).

15         Under the percentage of the fund method, the court may award class counsel a percentage

16  of the common fund recovered for the class; in the Ninth Circuit, the benchmark as to such fees is

17  25%.  *Id.*; *see also Bluetooth*, 654 F.3d at 942; *Norton v. Strategic Staffing Sols., L.C.*, No. 3:23-

18  cv-06648-JSC, 2025 WL 1666143, at *8 (N.D. Cal. June 12, 2025) ("The Ninth Circuit uses a 25

19  percent of the fund 'benchmark' for awarding fees.").  Special circumstances that could justify

20  varying the benchmark award include when counsel achieves exceptional results for the class,

21  undertakes extremely risky litigation, generates benefits for the class beyond simply the cash

22  settlement fund, or handles the case on a contingency basis.  *See In re Online DVD-Rental*

23  *Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015).  An explanation is necessary when the

24  court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir.

25  2000), but either way, "[s]election of the benchmark or any other rate must be supported by

26  findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*,

27  290 F.3d 1043, 1048 (9th Cir. 2002).

28  /////

1    Under the lodestar method, the court multiplies the number of hours the prevailing party

2    reasonably spent litigating the case by a reasonable hourly rate for counsel.  *Bluetooth*, 654 F.3d

3    at 941.  The product of this computation, the "lodestar" amount, yields a presumptively

4    reasonable fee.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

5    The Ninth Circuit has recommended that district courts apply one method but then cross-

6    check the appropriateness of the determined amount by employing the other as well.  *See*

7    *Bluetooth*, 654 F.3d at 944.  This diligence is particularly important when "counting *all* hours

8    expended," in a case "where the plaintiff has achieved only limited success," would yield an

9    "excessive amount" of fees, or when awarding a percentage of a "megafund would yield windfall

10    profits for class counsel in light of the hours spent on the case."  *Id.* at 942; *see also id.* at 945

11    ("Just as the lodestar method can confirm that a percentage of recovery amount does not award

12    counsel an exorbitant hourly rate, the percentage-of-recovery method can likewise be used to

13    assure that counsel's fee does not dwarf class recovery.") (internal quotation marks and citations

14    omitted).  Similarly, an upward adjustment of attorneys' fees may be justified if the recovery is

15    "too small . . . in light of the hours devoted to the case or other relevant factors."  *Six (6) Mexican*

16    *Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

17    Here, the Settlement Agreement provides that Class counsel will seek an award of

18    $437,500.00, equivalent to 35% of the MSA.  (Doc. No. 95 at 25.)  That amount is higher than the

19    25% benchmark established in the Ninth Circuit, *Bluetooth*, 654 F.3d at 942, but not an entirely

20    uncommon percentage for wage and hour class actions litigated in the Eastern District of

21    California.  *See Barbosa*, 297 F.R.D. at 450 (listing cases where courts approved attorneys' fees

22    of approximately one-third of the total settlement).  The proposed Settlement Agreement also

23    provides for an additional award of $97,000, which plaintiff explains is necessary to cover the

24    "litigation costs and expenses."  (Doc. No. 95 at 26.)

25    In explaining their proposed departure from the 25% benchmark, plaintiff's counsel state

26    that they "have litigated this matter for over five years" and are "well-experienced in wage-and-

27    hour class action litigation and used that experience to obtain a significant Settlement."  (Doc.

28    No. 95 at 25.)  They note that they engaged in "significant formal and informal discovery as well

1  as numerous party and third-party depositions." (Doc. No. 103 at 12.) Plaintiff's counsel also

2  point to the contested nature of this case, arguing that the parties "fully briefed numerous

3  significant motions." (Doc. No. 103 at 12.) While in the court's view a not insignificant portion

4  of the parties' motion practice was spent settling the pleadings, as it was not until plaintiff filed

5  his SAC that the court found that plaintiff had adequately stated any of his claims, plaintiff did

6  successfully defeat defendants' premature motion to deny class certification (Doc. Nos. 58, 74),

7  and the parties later fully briefed cross-motions regarding class certification (Doc. Nos. 75, 76,

8  79, 80, 81, 88), defendants' motion for partial summary judgment (Doc. Nos. 62, 67, 71), and a

9  motion to strike various declarations filed by plaintiff in support of class certification (Doc. Nos.

10 85, 89, 90), all of which motions were rendered moot before ruling by the parties' notice of

11 settlement (Doc. No. 91). Plaintiff's counsel note that they invested significant effort in

12 prosecuting this action and utilized their extensive experience, determination, and skill in

13 achieving a substantial settlement of the claims in light of the risks of the denial of class

14 certification and the limiting of claims through summary judgment, and that their requested fee is

15 commensurate with these considerations. (Doc. Nos. 96 at 26; 103 at 4–5, 13.)

16      Considering the relief obtained for Class Members and the contested issues in this case,

17 the court accepts a measured departure from the benchmark percentage at this preliminary

18 approval stage of the litigation. At the final approval stage, however, the court will carefully re-

19 examine the award of attorneys' fees and conduct a final lodestar cross-check. At that point, the

20 court will expect plaintiff's counsel to provide the requisite billing records and calculations for

21 cross check purposes and in justifying the fees they seek.[7] *See Fischel*, 307 F.3d at 1006–08

22 (noting that a district court has discretion to adjust a lodestar upward or downward, including by

23 way of a multiplier, based on certain reasonableness factors); *Bluetooth*, 654 F.3d at 941–42

24 (same). Additionally, plaintiff's counsel must provide an accounting or invoices documenting the

25 requested $97,000.00 in litigation expenses at the final approval stage.

26 _____

27 [7] "Though the court may well grant an award of that size under certain circumstances, the court cannot abdicate its obligation to protect the rights of absent members by simply defaulting to the method [of determining attorneys' fees] proffered by plaintiffs." *Perez v. All Ag, Inc.*, No. 1:18-

28 cv-00927-DAD-EPG, 2020 WL 1904825, at *9 (E.D. Cal. Apr. 17, 2020).

1              d.      *Incentive Payment*

2          While incentive awards are "fairly typical in class action cases," they are discretionary

3    sums awarded by the court "to compensate class representatives for work done on behalf of the

4    class, to make up for financial or reputational risk undertaken in bringing the action, and,

5    sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W.*

6    *Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *see also Staton v. Boeing Co.*, 327 F.3d 938,

7    977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments.").

8    Such payments are to be evaluated individually, and the court should look to factors such as "the

9    actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

10   benefitted from those actions . . . the amount of time and effort the plaintiff expended in pursuing

11   the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977

12   (citation omitted).

13         The named plaintiff in this action has requested an incentive payment of $10,000.  (Doc.

14   No. 95 at 16.)  According to the declaration of plaintiff Turner, he has "spent considerable time"

15   on this matter, including by "work[ing] with [his] attorneys on investigation and filing the

16   Complaint," "provid[ing] [his] attorneys with documents concerning [his] employment with

17   Defendants and with information about non-exempt employees' duties," "review[ing] documents

18   with [his] attorneys," "answer[ing] their questions, and help[ing] them figure out what additional

19   documents and witnesses may be needed for the case."  (Doc. No. 95-3 at ¶¶ 4–5.)  He states that

20   he has "made [him]self available to speak and meet with [his] attorneys whenever they asked to

21   speak" and that they "routinely check in."  (*Id*. at ¶ 5.)  Plaintiff Turner also declares that he

22   reviewed, considered, and approved the original core settlement terms and the full written

23   Settlement Agreement.  (*Id*. at ¶ 6.)

24         As noted, under the proposed settlement, the average putative Class Member will receive

25   $62.88.  (Doc. No. 95-1 at 15.)  Thus, a proposed incentive award of $10,000 is roughly 159

26   times the average amount each putative Class Member could expect to receive from the proposed

27   settlement and also represents 0.8% of the MSA.  The Ninth Circuit has repeatedly urged district

28   courts to be "vigilant in scrutinizing all incentive awards to determine whether they destroy the

                                                    30

1  adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163

2  (9th Cir. 2013) (citation omitted).  However, the Ninth Circuit has also approved an incentive

3  award that was 417 times larger than the individual awards of other class members, where the

4  incentive awards made up a relatively small portion (only 0.17%) of the settlement fund.  *In re*

5  *Online DVD-Rental Antitrust Litig.*, 779 F.3d at 947–48 (upholding the district court's

6  determination that awarding $5,000 each to the nine class representatives was appropriate even

7  though the objectors argued it was significantly larger than the $12 each unnamed class member

8  would receive).

9         Having reviewed the proposed $10,000.00 incentive awards for the named plaintiff, the

10  court notes that the amount requested may be disproportionate given the possible disparity with

11  the settlement's average or median award.  However, in recognition of the initiative demonstrated

12  by the named plaintiff, the court will preliminarily approve the proposed incentive award on the

13  condition that plaintiff demonstrate at the final approval stage that the requested award is

14  commensurate with and does not dwarf the average or median award to be received by the Class

15  Members.[8]

16                        e.      *Release of Claims*

17         All Class Members who do not timely opt-out of the settlement will be deemed to have

18  released the Released Parties from the Released Claims.  (Doc. No. 95-1 at 40–41.)  The Released

19  Class Claims appropriately track plaintiff's claims in this action and the settlement does not

20  appear to release unrelated claims that Class Members may have against defendant.  The named

21  plaintiff is also subject to a general release of claims, as described above.  Further, according to

22  the Settlement Agreement, plaintiff and the state of California shall fully discharge the Released

23  Parties from the Released PAGA Claims.  (*Id*. at 41.)  While not clearly stated, the court infers

24  from this that the parties intend for all Aggrieved Employees to be subject to the release of the

25  Released PAGA Claims, whether or not they opt-out of the Class.  *See Sakkab v. Luxottica Retail*

26

27  [8]  Plaintiff has provided the court with the average award expected from the settlement but has not
    provided estimates regarding the expected median, minimum, or maximum awards.  Plaintiff is
28  directed to provide this information in his motion for final approval.

                                          31

1    *N. Am., Inc.*, 803 F.3d 425, 436 n.10 (9th Cir. 2015) ("A judgment in a PAGA action binds absent

2    employees because it binds the government agency tasked with enforcing the labor laws.");

3    *O'Connor*, 201 F. Supp. 3d at 1134 (noting that fellow aggrieved workers are "effectively bound

4    by any judgment" and that "PAGA does not require class action procedures, such as notice and

5    opt-out rights").  Therefore, the court will preliminarily approve the release of claims provision,

6    but the parties are directed to more clearly state their intentions as to the Released PAGA Claims

7    provision along with any additional authority supporting the scope of that release in their motion

8    for final approval.

9    **C.    Proposed Class Notice and Administration**

10            For proposed settlements under Rule 23, "the court must direct notice in a reasonable

11    manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1); *see*

12    *also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement

13    under Rule 23(e).").  For a class certified under Federal Rule of Civil Procedure 23(b)(3), the

14    notice must contain, in plain and clear language:  (1) the nature of the action; (2) the definition of

15    the class certified; (3) the class claims, issues, or defenses; (4) the right of a class member to

16    appear through an attorney, if desired; (5) the right to be excluded from the settlement; (6) the

17    time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on

18    members of the class.  Fed. R. Civ. P. 23(c)(2)(B).  A class action settlement notice "is

19    satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those

20    with adverse viewpoints to investigate and to come forward and be heard."  *Churchill Vill., LLC*

21    *v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks and citations omitted).

22            Here, the Settlement Agreement provides that within 30 days of the date of entry of this

23    order, defendants "shall provide the Settlement Administrator with the following information for

24    each Class Member:  name, last known mailing address, last known email address, last known

25    telephone number, social security number, and the total number of workweeks in California as a

26    nonexempt employee during the Class Period and during the PAGA Period, or the relevant dates

27    from which the Settlement Administrator can separately calculate the number of workweeks for

28    each period."  (Doc. No. 95-1 at 32.)  Within 30 days of defendants providing this data, the

1  Settlement Administrator will perform a national change of address search, update the addresses

2  per the results of that search, and then mail the Class Notices to each Class Member by first-class

3  mail and electronic mail.  (*Id.*)  If a Class Notice is returned as undeliverable, the Settlement

4  Administrator "will make reasonable efforts to obtain a valid mailing address by using the Social

5  Security number of the Class Member and standard skip tracing to conduct a search for a correct

6  mailing address and by contacting Class Counsel and Defense Counsel."  (*Id.* at 32–33.)  Within

7  five calendar days from the date of the return of a Class Notice, the Settlement Administrator

8  shall promptly resend the Class Notice to a corrected address if one is found, or to the same

9  address if a search results in no corrected address.  (*Id.*)  Only one re-mailing to the same address

10  shall occur per address.  (*Id.*)

11      Class Members shall have sixty days from the initial mailing of the Class Notice to

12  respond, or an additional ten days from the date the Class Notice was re-mailed to respond, if

13  applicable.  (*Id.* at 21, 34.)  Class Members can dispute the number of workweeks they worked by

14  providing the Settlement Administrator with additional information and documentation

15  postmarked on or before the response deadline.  (*Id.* at 34.)  Class Members who wish to opt out

16  of the settlement must submit a request for exclusion by the response deadline.  (*Id.* at 34–35.)

17  The Settlement Administrator shall forward all requests for exclusion to Class counsel and

18  defense counsel within one business day of receipt.  (*Id.* at 35.)  Class counsel will also file a

19  declaration of the Settlement Administrator, no later than the filing of plaintiff's motion for final

20  approval, advising the court of a complete list of all members of the Class who have timely

21  requested exclusion from the settlement.  (*Id.*)

22      A review of the Class Notice confirms it provides adequate information regarding the

23  nature of the litigation, the essential terms of the settlement, how a Class Member would object to

24  the settlement, and how a Class Member would request to be excluded from the settlement.  (Doc.

25  No. 95-1 at 53–59.)  The Class Notice also identifies the Class counsel; specifies the amounts that

26  will be sought for the named plaintiff's incentive payment and Class counsel's fees and expenses;

27  and explains how to obtain additional information.  (*Id.* at 56, 59.)  The Class Notice adequately

28  informs the Class Members of the scope of the Released Claims.  (*Id.* at 57.)  The Class Notice

1   does not reference or describe the "Option to Terminate" section of the Settlement Agreement,

2   under which defendants retain the right to void the settlement if more than 5% of the Class

3   Members opt-out of the settlement.[9]  (Doc. No. 95-1 at 35.)

4          The court finds that the notice and the manner of notice proposed by plaintiff meet the

5   requirements of Federal Civil Procedure Rule 23(c)(2)(B) and 29 U.S.C. § 216(b) and that the

6   proposed mail delivery is appropriate under these circumstances.

7   **D.    Settlement Administrator and Settlement Administration Costs**

8          The parties have agreed to retain Simpluris to handle the notice and claim administration

9   process and request that Simpluris be appointed to serve as the Settlement Administrator.  (Doc.

10  No. 95 at 26–27.)

11         The estimated cost of administering this settlement is $45,300.  (*Id.* at 27.)  This estimate

12  is reasonable when compared with administration fees proposed in other settlements submitted to

13  this court involving a similar number of class members.  *See, e.g., Aguilar v. Wawona Frozen*

14  *Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017)

15  (administration costs of $45,000 for a $4.5 million settlement with a proposed class of

16  approximately 4,557 members); *see also Dakota Med., Inc. v. RehabCare Grp., Inc.,* No. 1:14-cv-

17  02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of

18  $94,000 for a $25 million settlement with a proposed class of approximately 12,976 members).

19         The court will appoint Simpluris as the Settlement Administrator.

20  /////

21

22  [9]  The parties have not provided any authority that would support a finding that this provision—
    and the 5% threshold—is reasonable, fair, and adequate under Rule 23.  However, the court has
23  identified some authority for the proposition that such provisions generally aid in encouraging
    settlement by limiting liability for defendants and providing leverage for plaintiffs.  *See Medina v.*
24  *NYC Harlem Foods Inc.*, No. 1:21-cv-01321-VSB, 2022 WL 1184260, at *6 (S.D.N.Y. Apr. 21,
    2022).  Accordingly, the court preliminarily deems the provision proposed as part of the
25  settlement here to be reasonable, fair, and adequate subject to review at the final approval
    hearing.  *See Jones v. Tirehub LLC*, No. 2:21-cv-00564-DB, 2023 WL 3687391, at *4 (E.D. Cal.
26  May 26, 2023) (granting preliminary approval of settlement agreement that included such a blow
    up clause with a 5% opt-out threshold); *del Toro Lopez v. Uber Techs., Inc*., No. 17-cv-06255-
27  YGR, 2018 WL 5982506, at *25 (N.D. Cal. Nov. 14, 2018) (granting final approval of settlement
    agreement involving a blow up clause with a 5% opt-out threshold).
28

**E.    Implementation Schedule**

The court sets the following implementation schedule, which is based on timelines set out in the Settlement Agreement:

| Event | Date |
|---|---|
| Deadline for defendants to provide Simpluris with Class Member contact information and data necessary to calculate settlement shares | No later than 30 days after entry of this order granting preliminary approval |
| Deadline for Simpluris to mail Class Notices to all Class Members | No later than 30 days after Simpluris receives Class Member contact information and settlement share data from defendant |
| Deadline for Class Members to challenge weeks worked information | No later than 60 days after Simpluris mails the Class Notices to all Class Members |
| Deadline for Class Members to file with the court and send to Simpluris any objections regarding the settlement | No later than 60 days after Simpluris mails the Class Notices to all Class Members |
| Deadline for Class Members to request exclusion from the settlement | No later than 60 days after Simpluris mails the Class Notices to all Class Members |
| Deadline to forward to the parties requests for exclusion from the settlement | No later than 1 day after receipt |
| Deadline for plaintiff to file a motion for final approval | No later than 35 days before the final approval hearing |
| Final Approval Hearing | March 2, 2026 at 1:30 p.m. |
| Deadline for defendants to deposit settlement amount with Settlement Administrator | No later than 10 business days after the date the Final Approval Order becomes final ("Effective Date") |
| Deadline for Settlement Administrator to issue checks to Class Members and Aggrieved Employees | No later than 10 days after receipt of the Maximum Settlement Amount |
| Deadline for recipients to cash settlement checks | One hundred twenty days (120) from the date it is issued or re-issued (if the initial check is returned as a result of an incorrect address) |

/////

1      In addition to the dates identified in this implementation schedule, the parties and

2   Simpluris are instructed to follow the remaining dates and time restrictions identified in the

3   Settlement Agreement (*See* Doc. No. 95-1 at 19–51).

**CONCLUSION**

5      For the reasons explained above:

6      1.    Plaintiff's motion for preliminary approval of class action settlement (Doc. No. 95)

7            is GRANTED;

8      2.    The proposed Class identified in the Settlement Agreement (Doc. No. 95-1) is

9            CERTIFIED for settlement purposes;

10     3.    Plaintiff's counsel, Edwin Aiwazian, Arby Aiwazian, and Joanna Ghosh of

11           Lawyers for Justice, PC, and LippSmith LLP, are APPOINTED as Class counsel

12           for settlement purposes;

13     4.    The named plaintiff Samuel Turner is APPOINTED as Class representative for

14           settlement purposes;

15     5.    Simpluris, Inc. is APPROVED as the Settlement Administrator;

16     6.    The proposed Class Notice (Doc. No. 95-1 at 53–59) is APPROVED in

17           accordance with Federal Rule of Civil Procedure 23;

18     7.    Before sending out the Class Notice, the court DIRECTS the parties or Simpluris

19           to fill in all blank or bracketed placeholders in the Class Notice with the

20           appropriate information;

21     8.    The proposed settlement detailed herein is APPROVED on a preliminary basis as

22           fair and adequate;

23     9.    The hearing for final approval of the proposed settlement is SET for Monday,

24           March 2, 2026 at 1:30 p.m. before the undersigned in Courtroom 4, with the

25           motion for final approval of class action settlement to be filed at least 35 days in

26           advance of the final approval hearing, in accordance with Local Rule 230(b); and

27   /////

28   /////

36

1        10.    The settlement implementation schedule set forth above is ADOPTED.

2    IT IS SO ORDERED.

3    Dated:   __**September 2, 2025**__

4                                     DALE A. DROZD
                                 UNITED STATES DISTRICT JUDGE